# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | : **TO BE FILED UNDER SEAL** |
| v. | : Hon. James B. Clark, III |
| JOSEPH SANTIAMO | : Mag. No. 19-3397 |
| | : **CRIMINAL COMPLAINT** |

I, Wilfred Jiroux, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

**SEE ATTACHMENT A**

I further state that I am a Task Force Officer with the Drug Enforcement Administration and that this Complaint is based on the following facts:

**SEE ATTACHMENT B**

continued on the attached page and made a part hereof.

_____
Task Force Officer Wilfred Jiroux
Drug Enforcement Administration

Sworn to before me, and
subscribed in my presence

September 23, 2019, at
Newark, New Jersey

HONORABLE JAMES B. CLARK III   _____
UNITED STATES MAGISTRATE JUDGE   Signature of Judicial Officer

## ATTACHMENT A

### COUNT ONE
**(Conspiracy to Unlawfully Distribute Controlled Substances)**

From on or about January 1, 2012 through on or about May 3, 2018, in Hunterdon and Middlesex Counties in the District of New Jersey, and elsewhere, the defendant,

**JOSEPH SANTIAMO,**

a licensed physician, did knowingly and intentionally conspire and agree with others to distribute and dispense, outside the usual course of professional practice and not for a legitimate medical purpose, mixtures and substances containing detectable amounts of Schedule II controlled substances, contrary to Title 21, United States Code, Section 841(a) and (b)(1)(C).

In violation of Title 21, United States Code, Section 846.

## ATTACHMENT B

I, Wilfred Jiroux, am a Task Force Officer with the United States Drug Enforcement Administration ("DEA"). I have been personally involved in the investigation of this matter. The information contained in this Criminal Complaint is based on my personal knowledge and on information obtained from other sources, including but not limited to: (a) statements made or reported by various witnesses with knowledge of relevant facts; (b) my review of publicly-available information relating to the defendant; and (c) my review of audio recordings and other communications. Because this affidavit is being submitted for the sole purpose of establishing probable cause to support the issuance of a Complaint, I have not included each and every fact known to the Government concerning this matter. Where statements of others are set forth herein, these statements are related in substance and in part. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged. Stated quantities and amounts are approximate.

1. At all times relevant to this Complaint:

### The Controlled Substances Act

a. The Controlled Substances Act ("CSA"), codified in Title 21 of the United States Code, and its promulgating regulations, classified drugs into five schedules depending on a drug's acceptable medical use and its abuse and dependency potential. Schedule I controlled substances, such as heroin, did not have an acceptable medical use in the United States. Schedule II through Schedule V controlled substances had acceptable medical uses.

b. The medical use of Schedule II controlled substances such as oxycodone, Percocet, morphine, and hydrocodone, was severely restricted because such drugs had a high potential for abuse. Oxycodone was an opioid pain medication and had among the highest potential for abuse and associated risk of fatal overdose. Oxycodone is available in time-release oral pill formulation, as well as in combination with other medications. Abusers of oxycodone often crush the protective time-release coating on the pill and, snort, ingest or inject it, thereby obtaining all of the drug at one time. Oxycodone used in this fashion produces a heroin-like euphoria. Percocet and Roxicodone are branded forms of oxycodone also used to treat pain and associated with a high risk of abuse. Hydrocodone is another powerful Schedule II opioid medication that is roughly as powerful as morphine and used to treat moderate to moderately severe pain.

c. Schedule III controlled substances, such as Tylenol with codeine, had a lower abuse potential than those in Schedule II, but a higher abuse potential than those in Schedule IV. Schedule IV substances include alprazolam, a/k/a "Xanax"; diazepam, a/k/a "Valium"; and clonazepam, which

were classified as benzodiazepines, a class of psychoactive drugs used to treat a range of conditions, including anxiety and insomnia. Many drug abusers combine opioids with benzodiazepines such as alprazolam, increasing the risk of potential overdose.

   d. Schedule V controlled substances represent the group with the least potential for abuse and consisted of preparations containing limited quantities of certain narcotics.

   e. Title 21, United States Code, Section 841(a)(1), provided that "[e]xcept as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." Title 21, United States Code, Section 802(10), provided that the term "dispense" meant "to deliver a controlled substance to an ultimate user . . . by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance and the packaging, labeling or compounding necessary to prepare the substance for such delivery." Title 21, United States Code, Section 802(21), provided that "'practitioner' means a physician . . . ."

   f. The CSA, specifically, 21 U.S.C. § 829, authorized Schedule II through Schedule V controlled substances to be dispensed to individuals by a valid prescription. For a prescription for a controlled substance to be valid it must be issued for a legitimate medical purpose by a registered practitioner acting in the usual course of his or her professional practice. 21 C.F.R. § 1306.04 ("An order purporting to be a prescription issued not in the usual course of professional treatment . . . is not a prescription within the meaning and intent of [21 U.S.C. § 829]").

   g. Physicians or practitioners must obtain and maintain a registration with the United States Drug Enforcement Administration ("DEA") authorizing them to prescribe controlled substances in the Schedules in which they are registered ("registered practitioner"). 21 C.F.R. § 1306.03.

   h. Consequently, a registered practitioner issuing prescriptions for controlled substances not in the usual course of professional treatment and not for a legitimate medical purpose violates the provisions of the CSA and is subject to its penalties. 21 C.F.R. § 1306.04.

   i. The CSA drug scheduling system is supplemented by the individual states according to local needs and conditions. In the State of New York, a physician must prescribe Schedule II drugs through an authorized electronic prescription, or, in certain cases, such as when the prescription will be dispensed out-of-state, via an Official New York State Prescription form. Information concerning transactions involving controlled substances is transmitted to state authorities via computer when the drugs are dispensed by

a pharmacist. This information is maintained by the New York State Prescription Monitoring Program ("NYPMP").

j.  The NYPMP is a statewide database that collects prescription data regarding controlled substances prescribed by medical practitioners and/or dispensed by pharmacies in New York. A similar program exists for controlled substances prescribed and dispensed in New Jersey. The NYPMP and similar programs collect, among other things, patient information; the name of the controlled substance prescribed, including strength, quantity, and the calculated days' supply[1]; the date a prescription was written; the date a prescription was filled; the name of the dispensing pharmacy; prescriber information, such as the name of the prescribing practitioner and the DEA registration number; and billing information, such as whether the patient paid cash or if the prescription was billed to a private health insurance plan or a federally-funded health insurance plan, such as Medicare or Medicaid.

### Defendant Joseph Santiamo

k.  Defendant JOSEPH SANTIAMO ("SANTIAMO") resided in Staten Island, New York and was a licensed physician in the State of New York.

l.  SANTIAMO owned and operated a medical practice focused on internal medicine and geriatric care located in Staten Island, New York (the "Santiamo Office"). SANTIAMO is a registered practitioner with the DEA and is authorized to Schedule II through V controlled substances in the usual course medical practice and for a legitimate medical purpose.

### The Defendant's Illegal Distribution of Controlled Substances

2.  Starting as early as September 2017, the DEA has been investigating the unlawful distribution of controlled substances by physicians outside of the usual course of their professional practice and not for a legitimate medical purpose. Through the investigation, SANTIAMO was identified based on allegations that he was operating a "pill mill."[2] As the investigation progressed, the DEA arrested four individuals as illegal

---

[1] The "days supply" refers to how many days the supply of dispensed medication will last based on the dosage instructions of the physician.

[2] A "pill mill" is a term used to describe an operation in which a doctor, clinic, or pharmacy is prescribing or dispensing narcotics outside the ordinary course of medical practice and without a legitimate medical purpose.

distributors of oxycodone in the Flemington, New Jersey area. These four individuals have since pled guilty to federal crimes and have been sentenced for distributing thousands of Oxycodone pills from prescriptions that were written by and obtained from SANTIAMO.

3. Based on my training and experience and conversations I have had with other law enforcement officers investigating diversion, certain "red flags" are indicators that registered practitioners or physicians are engaging in diversion—the prescribing of controlled substances not in the ordinary course of medical practice and not for a legitimate medical purpose.

4. For example, the following, among others, are common "red flags" or indicators of a "pill mill": (1) patients traveling great distances to the physician; (2) cash payments for medical services and prescriptions; (3) multiple patients living at the same address receiving identical, high-strength narcotics or controlled substances; (4) prescribing opioids with benzodiazepines (*e.g.*, Xanax or alprazolam), stimulants (*e.g.*, Adderall), and other "potentiators;" (5) pharmacy-shopping patients (patients who use multiple pharmacies to fill controlled substances); (6) doctor-shopping patients (patients seeing multiple doctors to obtain controlled substances); and (7) prescribing the highest strength available of a narcotic (*e.g.*, 2 mg Xanax or 10 mg Percocet). Moreover, for physicians like SANTIAMO who specialize in geriatric care, patient age may be relevant to determining whether a physician was acting within the ordinary course of his or her medical practice.

### SANTIAMO's Prescription Data

5. In early 2018, law enforcement agents requested information on SANTIAMO's prescription history from the NYPMP. The data indicated, among other things, that SANTIAMO has been prescribing Schedule II opioids and other controlled substances outside of the usual course of a professional practice. For instance, at least approximately 30,278 prescriptions written by SANTIAMO were filled between on or about January 1, 2012 and January 8, 2018, representing approximately 2.91 million dosage units. Combined, the Schedule II drugs oxycodone and hydrocodone, and the Schedule IV drug alprazolam, represented approximately 75% of all of the controlled substance dosage units prescribed by SANTIAMO. Approximately 88% of all of SANTIAMO's Schedule II prescriptions during this period were for oxycodone.

6. Moreover, on certain dates, SANTIAMO wrote prescriptions for controlled substances in doses that far exceed what might be medically

necessary for an ordinary patient. For example, on or about August 13, 2012, SANTIAMO wrote approximately 55 prescriptions for 46 unique patients for 6,710 dosage units, representing 1,650 days' supply of controlled substances. Also, on or about August 12, 2013, SANTIAMO wrote approximately 55 prescriptions for 44 unique patients for 5,934 dosage units of controlled substances. The calculated days' supply for the August 12, 2013 prescriptions was approximately 1,678 days, or more than a four and a half years' supply. On or about October 7, 2015, SANTIAMO wrote approximately 51 prescriptions for 32 unique patients for 4,804 dosage units, amounting to a 1,727 days' supply of controlled substances.

7. As of on or about January 1, 2018, the top three patients ("Patient-1," "Patient-2," and "Patient-3") who filled prescriptions written by SANTIAMO were all females under the age of 45. From 2012 through 2018, Patient-1 filled approximately 234 prescriptions from SANTIAMO—110 of which were for the Schedule II opioids hydrocodone and fentanyl, and another 58 of which were for alprazolam, a Schedule IV benzodiazepine. During that same time period, Patient-2 filled approximately 229 prescriptions from SANTIAMO—124 of which were for oxycodone and fentanyl, and 52 of which were for lorazepam, another Schedule IV benzodiazepine. The NYPMP data also revealed that another SANTIAMO patient ("Patient-4") who resided at the same address as Patient-2 filled approximately 60 prescriptions for oxycodone and 10 prescriptions for alprazolam from SANTIAMO at the same time Patient-2 was prescribed similar drugs. Patient-3, the third-ranking prescription receiver during the NYPMP data period, filled approximately 229 prescriptions written by SANTIAMO, 97 of which were for Schedule II amphetamines, 61 of which were for hydrocodone, and 52 of which were for alprazolam.

### *Surveillance and Evidence From the Santiamo Office*

8. In February and March of 2018, law enforcement agents conducted surveillance at the Santiamo Office. During their surveillance, law enforcement agents observed multiple patients come and go from the Santiamo Office, many of whom left carrying what appeared to the agents to be paperwork resembling a prescription form. Many of the patients appeared to be under the age of 50, thus, these individuals did not appear to need the services of a geriatric care physician such as SANTIAMO. Moreover, many patients who left the Santiamo Office carrying what appeared to be a prescription form had been observed entering the office just minutes earlier. Based on the observations of the agents, these patients were not inside the Santiamo Office long enough for them to have been examined by SANTIAMO, thus SANTIAMO could not have

reasonably determined that a prescription for a controlled substance was medically necessary.

9. On or about May 3, 2018, law enforcement agents conducted a lawful search of the Santiamo Office pursuant to a search warrant. The evidence recovered from the Santiamo Office included files and medical records related to SANTIAMO's patients. Patient files for approximately twenty-one of SANTIAMO's patients who were prescribed high amounts of opioid pain medication were evaluated by a medical expert. The expert concluded that SANTIAMO's treatment of these approximately twenty-one patients was outside of the bounds of any professional medical practice, and was marked by egregious overprescribing of opioids, promoting addiction and putting his patients' lives at risk. According to NYPMP and other prescription data, from on or about January 1, 2012 through on or about April 9, 2018, these approximately twenty-one patients were prescribed approximately 3.71 kilograms of actual oxycodone, representing approximately 130,613 dosage units of a variety of oxycodone products.

10. When law enforcement agents reviewed SANTIAMO's patient files, they discovered evidence that SANTIAMO had been soliciting sexual favors from his patients in exchange for opioid prescriptions. For example, from the patient file of a male patient of SANTIAMO's ("Patient-5"), agents recovered handwritten letters from Patient-5 to SANTIAMO in which Patient-5 referenced sexual acts that Patient-5 had engaged in with SANTIAMO in return for prescriptions. In the letters, which were dated from at least as early as May 2013 through May 2016, Patient-5 described his addiction to painkillers, and repeatedly pleaded with SANTIAMO to prescribe him oxycodone, Percocet, Roxicodone, and methadone to stave off the effects of withdrawal. Patient-5 also threatened to release audio and video recordings of sex acts involving SANTIAMO if SANTIAMO did not write him prescriptions. Notwithstanding the statements about Patient-5's abuse of opioids in these letters, from in or around May 2013 through April 2016, Patient-5 filled approximately 204 prescriptions for opioids written by SANTIAMO.

### SANTIAMO's Recorded Interview

11. On or about May 3, 2018, on the day that law enforcement agents searched the Santiamo Office, SANTIAMO agreed to give a voluntary interview to law enforcement agents, which was recorded. During the interview, SANTIAMO stated the following:

a. When asked where his patients live, SANTIAMO replied that the majority of them lived in Staten Island, but at least two lived in Brooklyn. He stated that none of his patients traveled far to see him. Later in the interview, SANTIAMO admitted that he treated patients who lived in New Jersey, Pennsylvania, upstate New York, and Florida.

b. When asked what type of prescriptions he usually writes for his patients, SANTIAMO stated that he writes "everything," but mainly Roxicodone prescriptions. SANTIAMO writes Roxicodone prescriptions mostly for his "younger patients" because they are "addicted to it." SANTIAMO stated that if a patient came to him addicted to Roxicodone, he would continue to prescribe the drug so that the patient would not get the substance somewhere else.

c. SANTIAMO does not generally write prescriptions for tramadol[3] because there is "no street value in tramadol . . . nobody wants it." SANTIAMO is aware that the street value of oxycodone is between $30 and $40 per pill.

d. SANTIAMO is aware that taking opioids and benzodiazepines together is dangerous. Notwithstanding this, SANTIAMO acknowledged that he had previously prescribed patients oxycodone and alprazolam at the same time.

e. SANTIAMO regularly receives notices from insurance companies, including Medicare, claiming that he writes more prescriptions for pain medication than the average prescriber.

f. SANTIAMO admitted that he has had sexual encounters with at least five of his patients, including engaging in sex acts with his patients inside the Santiamo Office. SANTIAMO wrote Roxicodone prescriptions for each of the patients he had a sexual relationship with. When asked how the sexual relationship with his patients first started, SANTIAMO replied, "they had a need."

---

[3] Tramadol is a Schedule IV controlled substance, and is a synthetic opioid that acts as a narcotic-like painkiller.